IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| BROOKE JUNKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 3:22-cv-1962-DWD |
| MASCOUTAH COMMUNITY | ) | |
| SCHOOL DISTRICT 19 BOARD OF | ) | |
| EDUCATION and TODD GOBER, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM & ORDER

DUGAN, District Judge:

Before the Court is Defendants' Motion to Dismiss ("Motion") (Docs. 22 & 23) under Federal Rule of Civil Procedure 12(b)(6). Plaintiff filed a Memorandum in Opposition (Doc. 24) to the Motion. For the following reasons, the Motion is **DENIED**.

## I. Background

Plaintiff is a female who, during the fall of 2021, was a senior on the Mascoutah High School girls' volleyball team. (Doc. 1, pgs. 1, 4). According to the Complaint, during that season and in prior seasons, Defendant Gober, who had been the varsity head coach since 2014, allegedly subjected the team members to "demoralizing and degrading activities" at practice. (Doc. 1, pgs. 1-2, 4-6). Plaintiff eventually met with a counselor at Mascoutah High School about her experience on the team. (Doc. 1, pgs. 2, 6). Defendant Gober allegedly became aware of that meeting, and of the meetings of three other seniors with the counselor, then "scolded" the four seniors and imposed conditions on their ability to remain on the team. (Doc. 1, pgs. 8-10). Despite Plaintiff's parent's reports to

and meetings with Defendant Gober and/or other Mascoutah High School officials, the Mascoutah Community School District 19 Board of Education ("District") allegedly failed to take action to protect Plaintiff or discipline Defendant Gober. (Doc. 1, pgs. 2, 8, 11-15).

Plaintiff filed a Complaint (Doc. 1) against Defendants, alleging: (1) violations of Title IX, 20 U.S.C. § 1681, due to sex discrimination and retaliation by the District (Counts I & 2); (2) violations of 42 U.S.C. § 1983 due to sex discrimination and infringements of the right to free speech by the District (Counts III & IV); (3) violations of 42 U.S.C. § 1983 due to sex discrimination and infringements of the right to free speech by Defendant Gober (Counts V & VI); (4) violations of the Illinois Civil Rights Act (740 ILCS 23/1 *et seq.*) due to sex discrimination and retaliation by the District (Counts VII & VIII); and (5) the intentional infliction of emotional distress by each Defendant under Illinois law (Count IX & X). Now, Defendants seek a dismissal of the Complaint under Rule 12(b)(6).

Plaintiff's specific factual allegations, as well as each party's arguments in relation to the Motion, are incorporated into the analysis section below.

## II. Analysis

A motion to dismiss under Rule 12(b)(6) challenges a complaint for the failure to state a claim for which relief may be granted. *See Firestone Fin. Corp.*, 796 F.3d 822, 825 (7th Cir. 2015) (quoting *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014)). To survive such a motion, which tests the sufficiency of the complaint but not the merits of the case, a plaintiff must allege enough facts to state a facially plausible claim for relief. *See Kloss v. Acuant, Inc.*, 462 F. Supp. 3d 873, 876 (7th Cir. 2020) (quoting *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 878 (7th Cir. 2012)); *Fosnight v. Jones*,

41 F.4th 916, 921-22 (7th Cir. 2022) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility means a plaintiff pled enough facts to draw reasonable inferences as to liability. *See Fosnight*, 41 F.4th at 922 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A complaint need not allege "detailed factual allegations," but it must state enough facts to lift the claim above the speculative level. *See Kloss*, 462 F. Supp. 3d at 876 (citing *Twombly*, 550 U.S. at 555). "Threadbare recitals" of the elements, supported by mere conclusions, do not suffice. *See Trivedi v. Wells Fargo Bank, N.A.*, 609 F. Supp. 3d 628, 631 (N.D. Ill. 2022) (quoting *Iqbal*, 556 U.S. at 678). When ruling, the Court accepts all well-pleaded facts as true and draws all inferences for Plaintiff. *See id.* (quoting *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)); *accord Kloss*, 462 F. Supp. 3d at 874-75.

### A. Sex Discrimination and Retaliation by the District Under Title IX (Counts I & II) and the Illinois Civil Rights Act (Counts VII & VIII)

Section 1681(a) of Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Similarly, Section 5 of the Illinois Civil Rights Act provides: "No unit of State, county, or local government in Illinois shall…exclude a person from participation in, deny a person the benefits of, or subject a person to discrimination under any program or activity on the grounds of that person's…gender." 740 ILCS 23/5. When interpreting this provision, the Illinois courts look to cases relating to alleged violations of federal civil rights statutes. *See Central Austin Neighborhood Ass'n v. City of Chicago*, 2013 IL App (1st) 123041, ¶ 11; *see also Howard v. Cook County Sheriff's*

*Office*, 989 F.3d 587, 609 (7th Cir. 2021) (noting, with respect to state-law claims, it was "perfectly acceptable" for the district court to accept the plaintiffs' invitation to treat as parallel and not separately analyze state and constitutional claims).

Further, there are two requirements for institutional liability under Title IX. *See C.S. v. Madison Metro. School Dist.*, 34 F.4th 536, 541 (7th Cir. 2022); *accord Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010). First, a school official with authority to take corrective action must have actual knowledge of the sex discrimination. *See C.S.*, 34 F.4th 541-44 (citing *Gebser v. Lago Vista Independent School District*, 542 U.S. 274, 290 (1998)). The school official acquires actual knowledge by learning misconduct, rising to the level of sex discrimination, occurred. *See id.* at 540. The misconduct "must be 'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.' " *See id.* at 542 (quoting *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999)); *see also Jauquet v. Green Bay Area Catholic Education, Inc.*, 996 F.3d 802, 811 (7th Cir. 2021) (stating a Title IX violation requires a systemic and substantial disparity amounting to a denial of equal opportunity); *Doe v. Bd of Educ. of City of Chicago*, 611 F. Supp. 3d 516, 527-28 (N.D. Ill. 2020) (noting courts have recognized harassment by a teacher inherently harms students and affects the educational experience). If the misconduct does not amount to sex discrimination, the school cannot be on notice that it is liable for failing to act. *See C.S.*, 34 F.4th at 541-42.

Second, the school official's response must amount to a deliberate indifference to the sex discrimination, such that it represents an official decision not to remedy the Title IX violation. *See id.* at 541-42. A school district must respond with measures aimed to end

4

the known sex discrimination and to limit additional sex discrimination. *See id*. at 542 (quoting *Gebser*, 542 U.S. at 289). However, the response need not be perfect or successful as long as "it is not so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *See id*. at 543 (quoting *Gebser*, 542 U.S. at 290).

## 1. Sex Discrimination

A claim of sex discrimination under Title IX requires the plaintiff to allege (1) the educational institution received federal funding, (2) the plaintiff was excluded from participation in or denied the benefits of an educational program, and (3) the educational institution discriminated against the plaintiff based on sex. *See Jauquet*, 996 F.3d at 810 (quoting *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019)); *see also Smith v. Metro. School Dist. Perry Twp.*, 128 F.3d 1014, 1021-22 (7th Cir. 1997) (holding a teacher's sexual harassment of a student constitutes sex discrimination under Title IX).

Defendants argue Plaintiff failed to allege any misconduct was sexual or due to her being female, as her allegations suggest certain female teammates were treated better than the four seniors. (Doc. 23, pgs. 3-4). Healthy teammates were allegedly treated better than injured teammates and teammates on the winning side of scrimmages were treated better than teammates on the losing side of scrimmages. (Doc. 23, pg. 4). Defendants also argue Plaintiff merely states general allegations about the treatment of male athletes at Mascoutah High School, which does not suffice under Title IX. (Doc. 23, pgs. 4-5).

In response, Plaintiff argues she adequately pled sex discrimination based on theories of both differential treatment and harassment. (Doc. 24, pg. 3). In terms of differential treatment, Plaintiff argues male athletes at Mascoutah High School were not

subjected to the same "demoralizing and degrading activities" at practice. (Doc. 24, pg. 3). Further, male athletes could expect that their communications with a counselor would remain confidential, they would not be punished for speaking to a counselor, and they could participate on their teams without conditions. (Doc. 24, pg. 4). Relating to alleged harassment, Plaintiff argues her participation in the "demoralizing and degrading activities" at practice was unwelcomed, "unquestionably sexual," and a condition for team membership. (Doc. 24, pgs. 3, 5). Under these theories, Plaintiff argues it is inconsequential that other females were subjected to better treatment. (Doc. 24, pg. 5).

Here, Plaintiff alleged the District received federal funding for its educational programs and activities. *See Jauquet*, 996 F.3d at 810; (Doc. 1, pgs. 16-17). Plaintiff also plausibly alleged that sex discrimination by the District excluded her from participation in or denied her the benefits of an educational program. *See Jauquet*, 996 F.3d at 810. Specifically, Plaintiff alleged the "demoralizing and degrading [practice] activities" included, *inter alia*, "spanking machines," where girls on the winning team of a scrimmage stood in a line, with their legs spread apart, as girls on the losing team of the scrimmage crawled through their legs and received a spanking. (Doc. 1, pgs. 1-2, 5-6). On August 27, 2021, Plaintiff and three other seniors met with a school counselor about their experience on the volleyball team. (Doc. 1, pgs. 2, 6-7). One of the seniors allegedly made a statement that compelled the counselor "to report minimal information to administration," *i.e.*, the Mascoutah High School athletic director, who left the high school, drove to Defendant Gober's place of employment, and informed Defendant

6

Gober of the concerns reported to the counselor. (Doc. 1, pgs. 2, 7). Plaintiff also alleges male athletes were not subjected to the same treatment. (Doc. 1, pgs. 19, 23, 27, 36, 44, 48).

From these allegations, it is plausible to conclude that Plaintiff complained of sex discrimination to the counselor and that the information received by the counselor from Plaintiff and/or her other teammates was immediately reported to a Mascoutah High School official, namely, the athletic director, who conceivably had the authority to take corrective action. *See C.S.*, 34 F.4th 540-44. It is notable, too, that Plaintiff's mother, on November 18, 2021, which was at or near the end of the volleyball season, contacted the Mascoutah High School principal, athletic director, and counselor about the alleged practice activities. (Doc. 1, pgs. 2, 15). In the end, Plaintiff alleges Defendant was never disciplined and, in fact, remains the varsity volleyball coach to this day. (Doc. 1, pgs. 2, 14). Plaintiff admits certain "confidential expectations" were implemented in response to reviews by the District superintendent, Mascoutah High School principal, and Mascoutah High School athletic director, but she was not informed of that action until March 1, 2022, which was after the volleyball season. *See C.S.*, 34 F.4th 541-42.

The Court emphasizes that questions remain about, *inter alia*, the information reported by Plaintiff, the treatment of males and female athletes at Mascoutah High School, the responses of the school officials, and the severity, pervasiveness, and objective offensiveness of the alleged misconduct by Defendant Gober. *See id*. at 542; *Jauquet*, 996 F.3d at 811; *Doe*, 611 F. Supp. 3d at 527-28. At this stage, the threshold for a Complaint to survive scrutiny is not high. Thus, the Court merely **FINDS** Plaintiff has plausibly stated

claims for sex discrimination under Title IX (Count I) and the Illinois Civil Rights Act (Count VII). *See Kloss*, 462 F. Supp. 3d at 876; *Fosnight*, 41 F.4th at 921-22.

## 2. Retaliation

Title IX's prohibition on sex discrimination encompasses retaliation against a person who complains of sex discrimination. *See Milligan v. Bd of Tr. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)). A plaintiff must plead and prove (1) he or she engaged in statutorily protected activity, (2) he or she suffered a materially adverse action, and (3) there is a causal connection between the statutorily protected activity and the materially adverse action. *See id.* (quoting *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687-88 (7th Cir. 2010); *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012)); *accord Pogorzelska v. VanderCook College of Music*, 442 F. Supp. 3d 1054, 1064 (N.D. Ill. 2020).

Defendants argue Plaintiff failed to allege she engaged in protected activity by, *e.g.*, complaining of sex discrimination to the District. (Doc. 23, pgs. 5-6). While Plaintiff spoke to a counselor at Mascoutah High School, Defendants suggest there are no facts indicating the conversation involved complaints of sex discrimination. (Doc. 23, pg. 6).

In response, Plaintiff argues she was not specifically required to complain of sex discrimination when speaking to the counselor. (Doc. 24, pg. 5). Rather, Plaintiff could merely oppose a practice that she reasonably believed to be unlawful under Title IX. (Doc. 24, pg. 6). Plaintiff argues discussions with the counselor about her experience on the volleyball team and Defendant Gober, including about the alleged practice activities, satisfies this requirement. (Doc. 24, pg. 6). Further, Plaintiff argues Defendant Gober

8

imposed "degrading conditions" on her continued membership on the volleyball team after the counselor reported certain information to the athletic director. (Doc. 24, pgs. 6-7). Plaintiff emphasizes, after the complaints of her parents to the athletic director and principal, the District took no action against Defendant Gober. (Doc. 24, pg. 7).

Again, in this case, Plaintiff alleges, on August 27, 2021, she spoke with a counselor about her experience on the volleyball team, which could include a discussion of the "demoralizing and degrading [practice] activities." (Doc. 1, pgs. 2, 6). Three of her teammates also spoke with the counselor on that date. (Doc. 1, pgs. 2, 7). Thereafter, the counselor "report[ed] minimal information" to the athletic director, who allegedly left the high school, drove to Defendant Gober's place of employment, and informed Defendant Gober of the concerns that were reported to the counselor. (Doc. 1, pgs. 2, 7).

At a practice that afternoon, Defendant Gober allegedly pulled the four seniors aside for a private meeting, at which time he "scolded the four seniors for approximately 45 minutes." (Doc. 1, pg. 8). Defendant Gober allegedly singled Plaintiff out as "poison," indicated the four seniors betrayed him by speaking to the counselor, told the four seniors they were not to see or speak to the counselor again, and stated the four seniors could not participate in practice that day. (Doc. 1, pgs. 2, 8). Defendant Gober also allegedly stated the four seniors were weak, disrespectful for going outside the chain-of-command, out for his job, and trying to tell him how to run the volleyball program. (Doc. 1, pg. 8).

On the following Sunday, August 29, 2021, Plaintiff's father, who was the assistant principal at Mascoutah High School, met with Defendant Gober in his personal capacity. (Doc. 1, pg. 10). "The meeting was entirely unproductive," as Plaintiff's father "was not

successful in convincing Gober to resolve the matter without punishing the four senior[s]…for talking to the school counselor." (Doc. 1, pg. 10). Defendant Gober allegedly stated he was going to punish the four seniors to set an example. (Doc. 1, pg. 8).

At the next practice, which was held on Monday, August 30, 2021, Plaintiff alleges Defendant Gober again pulled Plaintiff and the three other seniors aside for a private meeting. (Doc. 1, pg. 8). Defendant Gober allegedly decided, if the four seniors wanted to remain on the team, there would be conditions imposed for the remainder of the season. (Doc. 1, pg. 8). Defendant Gober allegedly stripped the four seniors of their titles as team captains and decided there would be no team captains for the rest of the season. (Doc. 1, pg. 8). Defendant Gober also decided no injured players could travel to away games, sit on the bench during home games, be on the court during pregame warmups, or line up with the team for the National Anthem. (Doc. 1, pgs. 8-9). Thereafter, the four seniors were also required to set up and take down the volleyball nets after practices and home games, which was typically not a task for seniors. (Doc. 1, pg. 10). The four seniors were allegedly told to make it look like they were doing this task on their own and not as a punishment. (Doc. 1, pg. 10). The four seniors were also prohibited from leading team stretches, participating in coin tosses, or organizing team events. (Doc. 1, pg. 10).

At the time the conditions were imposed, Plaintiff was one of three injured players on the team. (Doc. 1, pg. 9). Previously, despite her injury, Plaintiff sat next to Defendant Gober on the bench, was allowed to stand with the team for the National Anthem, and was permitted to remain on the court for pregame warmups. (Doc. 1, pg. 9). Plaintiff alleges the male athletes at Mascoutah High School were not subjected to this

10

treatment. (Doc. 1, pgs. 19, 23, 27, 36, 44, 48). Regardless of injuries, males could travel and otherwise participate with their teams, including by sitting on the bench during games. (Doc. 1, pgs. 19, 24, 27, 36, 45, 49). Males could also "expect that their confidential communications with school counselors concerning intimidation w[ould] not be reported directly to the person doing the intimidating." (Doc. 1, pgs. 19, 23, 27, 36, 44, 48). Likewise, males could expect that they would not be punished for speaking to the school counselors or expressing concerns to administrators." (Doc. 1, pgs. 19, 23, 27, 36, 45, 48).

In response, the District allegedly failed to discipline or terminate Defendant Gober, or take any other action to protect the team members, and instead allowed him to continue coaching with the conditions in place. (Doc. 1, pgs. 2, 14). This was despite complaints by Plaintiff's parents to Defendant Gober, the principal and athletic director at Mascoutah High School, and two members of the Board of Education. (Doc. 1, pg. 2).

Aside from Plaintiff's father's meeting with Defendant Gober on August 29, 2021, Plaintiff's mother met with the principal, athletic director, and counselor from Mascoutah High School on September 2, 2021. (Doc. 1, pgs. 11-12). She allegedly relayed the events that had transpired since Plaintiff met with the counselor on August 27, 2021. (Doc. 1, pg. 11). Plaintiff's mother also sought an answer as to how the principal "would protect Plaintiff and the other volleyball players." (Doc. 1, pg. 11). She reiterated, "Gober used the fact that Plaintiff and her friends saw a school counselor against them" after the athletic director "went out of his way to…inform Gober" of that meeting. (Doc. 1, pg. 12). Plaintiff's mother also presented a journal in which Plaintiff detailed the private meeting(s) held between Defendant Gober and the four seniors. (Doc. 1, pg. 13). Plaintiff's

mother requested a full investigation into his alleged misconduct. (Doc. 1, pg. 13). But, according to Plaintiff, she never received a follow-up on an investigation. (Doc. 1, pg. 14).

Two months later, on November 8, 2021, which was near the end of the season, Plaintiff's mother informed two School Board members "of [a] players-only banquet, her concern that Gober had been given too much power, and its detriment to her daughter." (Doc. 1, pg. 14). Plaintiff's mother also allegedly indicated her concerns regarding Defendant Gober's "retaliation…for meeting with the school counselor." (Doc. 1, pg. 14).

Further, on November 18, 2021, after Plaintiff informed her mother of the alleged "demoralizing and degrading [practice] activities," Plaintiff's mother reached out to the principal, athletic director, and counselor to "reiterate[] her prior concern that Gober used the fact that the four seniors visited a counselor against them[] and [to] relay[] the additional information she had recently learned from Plaintiff." (Doc. 1, pgs. 1-2, 4-6, 13, 15). She asked, "[w]hat steps are being taken to rectify this issue and make sure any athlete, whether male or female[,] has the right to pursue mental health avenues, even if the coach disagrees, without receiving punishments or actions against them?" (Doc. 1, pg. 15). Again, according to Plaintiff, the above-described concerns were reviewed by the District's superintendent and the Mascoutah High School principal and athletic director, resulting in "confidential expectations" being instituted. (Doc. 1, pg. 16). Plaintiff alleges that action was not taken until March 1, 2022, which was after the season. (Doc. 1, pg. 16).

With these allegations, Plaintiff has plausibly alleged a claim of retaliation against the District under Title IX. Again, Title IX prohibits retaliation against a person who complains of sex discrimination, and it is plausible to conclude that Plaintiff's discussions

with the counselor constituted protected activity and included such complaints. *See Milligan*, 686 F.3d at 388; *Pogorzelska*, 442 F. Supp. 3d at 1064; *see also Conviser*, 532 F. Supp. 3d at 595 ("[S]peaking out against sex discrimination is a recognized protected activity under Title IX."); (Docs. 1, pgs. 1-2, 4-6; 24, pg. 6). On that same day, the counselor informed the Mascoutah High School athletic director, who is arguably an official with the authority to take corrective action, of certain information related to the discussions between herself and the four seniors. *See C.S.*, 34 F.4th 540-44; (Doc. 1, pgs. 2, 7). The athletic director allegedly informed Defendant Gober of the concerns reported to the counselor. (Doc. 1, pgs. 2, 7). In response to that information, Defendant Gober allegedly engaged in conduct described above. (Doc. 1, pgs. 2, 8-10). Notably, Plaintiff alleges, before speaking to the counselor, she was not subjected to any conditions. (Doc. 1, pg. 9).

For these reasons, Plaintiff also plausibly alleged a causal connection between the statutorily protected activity, *i.e.*, the discussions with the counselor, and the adverse material action, *i.e.*, the conditions for remaining on the volleyball team. *See Milligan*, 686 F.3d at 388; *see also Conviser v. DePaul Univ.*, --- F. Supp. 3d ----, 2023 WL 130483, *13 (N.D. Ill. Jan. 9, 2023) ("At the pleading stage, a Title IX retaliation plaintiff need not plead evidence, but rather must only 'plausibly allege a causal connection between protected activity and the retaliation.' "); *Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 596 (N.D. Ill. 2021) (stating a "primary consideration for causation," on a motion to dismiss, is the presence of "some 'retaliatory motive' connecting the protected activity and adverse action," and noting other evidentiary considerations such as suspicious timing, ambiguous statements, the behavior toward other members of the protected group, the

better treatment of similarly situated individuals, and evidence of pretext). Despite the alleged misconduct, the alleged knowledge of the misconduct by various District officials, and the implementation of certain "confidential expectations" in response to the alleged misconduct, Plaintiff states Defendant Gober was never disciplined and remains the varsity volleyball coach to this date. *See C.S.*, 34 F.4th 541-42; (Doc. 1, pgs. 2, 14).

The Court again emphasizes that questions remain about, *inter alia*, the information reported by Plaintiff, the responses of the school officials, and the materiality of the adverse actions allegedly suffered by Plaintiff due to the actions of Defendant Gober. *See id*. at 542; *see also Burwell v. Pekin Comm. High School Dist. 303*, 213 F. Supp. 2d 917, 934 (C.D. Ill. 2002) (noting "not everything that makes a plaintiff unhappy is an actionable adverse action," as there must be more than a mere inconvenience or alteration of responsibilities). At this stage, the Court merely **FINDS** the allegations plausibly state claims for retaliation by the District under Title IX (Count II) and the Illinois Civil Rights Act (Count VIII). *See Kloss*, 462 F. Supp. 3d at 876; *Fosnight*, 41 F.4th at 921-22.

### B. Sex Discrimination and Infringements of the Right to Free Speech by the District (Counts III & IV) and Defendant Gober (Counts V & VI) under 42 U.S.C. § 1983

Section 1983, in part, states: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. To state a § 1983 claim against the District under *Monell*, Plaintiff must plead: (1) an action under a District policy; (2) culpability, meaning final policymakers

were deliberately indifferent to a known risk that the policy would lead to constitutional violations; and (3) a constitutional injury. *See Walker as Next Friend of Z.R. v. Bd of Educ. of City of Chicago*, No. 19-cv-4115, 2021 WL 1143517, *4 (N.D. Ill. March 25, 2021) (citing *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020)); *Horwitz v. Bd of Educ. of Avoca School Dist.*, No. 37, 260 F.3d 602, 619 (7th Cir. 2001) (stating whether a particular official has final policymaking authority is a question of state law). The first element is satisfied by an express policy that was adopted and promulgated by the District's officers, an informal but widespread practice or custom, or an action by a final policymaker that was authorized by the District. *See Walker*, No. 19-cv-4115, 2021 WL 1143517, *4 (citing *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020)); *see also Gernetzke v. Kenosha Unified School Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001) (stating "[the plaintiffs] must show that the district itself, which is to say the officials or official boards that constitute the relevant final decisionmaking authority…was directly responsible for the deprivation," and "[o]nly the delegation…of final authority makes the 'delegate' the final authority."); *accord J.H. v. School Town of Munster*, 160 F. Supp. 3d 1079, 1086 (N.D. Ind. 2016).

### 1. Sex Discrimination

The Equal Protection Clause of the Fourteenth Amendment bars state and local governments from discriminating based on certain protected classifications, such as sex. *See Doe*, 611 F. Supp. 3d at 532 (quoting *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010)). To adequately plead an equal protection claim under § 1983, a plaintiff must allege he or she was treated differently due to sex and that the defendant acted with a discriminatory intent. *See id.* (citing *Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000));

*accord Moore v. Freeport Comm. Unit Sch. Dist. No. 145*, 570 F. Supp. 3d 601, 611 (N.D. Ill. 2021). A plaintiff need not identify specific examples of similarly situated individuals, especially where he or she plausibly alleges a discriminatory intent. *See Doe*, 611 F. Supp. 3d at 533 (quoting *Miller v. City of Monona*, 784 F.3d 1113, 1120 (7th Cir. 2015); citing *Taylor v. Nunez*, No. 18-cv-7844, 2019 WL 5393996, *4 (N.D. Ill. Oct. 22, 2019); *Myers v. Joliet Twp. High Sch. Dist. No. 204*, No. 12-cv-1866, 2013 WL 3874057, *4 (N.D. Ill. July 26, 2013)).

Defendants argue Plaintiff supports this claim with conclusory allegations related to the treatment of male athletes at Mascoutah High School. (Doc. 23, pg. 7). Indeed, Defendants argue Plaintiff could not allege the existence of a male comparator, which is necessary to her claim, because Defendant Gober did not coach male sports. (Doc. 23, pg. 8). Similarly, Defendants argue Plaintiff failed to allege Defendant Gober displayed a discriminatory intent toward females when compared to males. (Doc. 23, pgs. 8-9). Instead, he treated other female athletes better than the four seniors. (Doc. 23, pg. 9).

In the context of *Monell*, Defendants argue only the District's Board of Education, not the counselor, principal, or athletic director, had final policymaking authority. (Doc. 23, pgs. 9-10). Defendants note it was only at the end of the volleyball season that Plaintiff's mother allegedly complained to two individual members of the Board of Education. (Doc. 23, pg. 10). Defendants posit, "the Board members could not…fail[] to address an alleged wrong that they were not notified of until after the volleyball season." (Doc. 23, pg. 10). In Defendant's view, neither Plaintiff nor her parents ever specifically complained about sex discrimination and there was no indication that the Board of

16

Education intentionally discriminated against Plaintiff or turned a blind eye to any purposeful discrimination by Defendant Gober. (Doc. 23, pgs. 10-11).

In response, Plaintiff argues Defendants seek to apply evidentiary standards to the pleadings. (Doc. 24, pg. 8). Plaintiff argues it was merely incumbent on her to plausibly allege sex discrimination. (Doc. 24, pg. 8). For example, in terms of discriminatory intent, Plaintiff argues she was required to plead that Defendants intended to treat her differently than male athletes or, as it relates to the District, knew about, facilitated, or condoned sex discrimination. (Doc. 24, pgs. 9-10). Plaintiff also argues it is impossible to have a similarly situated player who was not part of her protected class but who played for Defendant Gober, as amateur male and female athletes participate on separate sports teams and Defendant Gober did not coach male sports teams. (Doc. 24, pg. 9). Regardless, Plaintiff argues it is appropriate to look to male comparators at Mascoutah High School, who play on different teams with different coaches, under § 1983. (Doc. 24, pg. 9).

Finally, relating to *Monell* liability, Plaintiff notes two members of the Board of Education were aware of Defendant Gober's conduct. (Doc. 24, pg. 12). In Plaintiff's view, it is inconsequential that those two members of the Board of Education were informed of the misconduct at the end of the season. (Doc. 24, pg. 12). Plaintiff also disputes final policymaking authority was vested in the Board of Education, as it vested Defendant Gober with final policymaking authority for the volleyball team. (Doc. 24, pgs. 12-13).

As discussed above, Plaintiff alleges she was required to participate in "demoralizing and degrading [practice] activities," including, *inter alia*, "spanking machines." (Doc. 1, pgs. 1-2, 5-6). Defendant Gober allegedly intended to intimidate and

17

humiliate, as well as exert power and control over, the team. (Doc. 1, pg. 6). Plaintiff eventually met with the counselor on August 27, 2021, at which time it is plausible that she discussed sex discrimination by Defendant Gober. (Doc. 1, pgs. 2, 6). Shortly after learning of that meeting and the meetings of the other seniors, Defendant Gober confronted the four seniors and imposed conditions on team membership. (Doc. 1, pg. 8).

Plaintiff also alleges male athletes were not subjected to such treatment. (Doc. 1, pgs. 19, 23, 27, 36, 44, 48). As the parties agree, Defendant Gober did not coach males and, therefore, did not engage in differential treatment. However, as to the District, it is relevant that Plaintiff alleges male athletes, regardless of injuries, could expect to travel and otherwise participate with their teams, including by sitting on the bench during games. (Doc. 1, pgs. 19, 24, 27, 36, 45, 49). Males could also "expect that their confidential communications with school counselors concerning intimidation w[ould] not be reported directly to the person doing the intimidating." (Doc. 1, pgs. 19, 23, 27, 36, 44, 48). Likewise, males could expect that they would not be punished for speaking to the school counselors or expressing concerns to administrators." (Doc. 1, pgs. 19, 23, 27, 36, 45, 48).

Further, the District allegedly failed to discipline or terminate Defendant Gober, or take any other action to protect the team members, and instead allowed him to continue coaching with the conditions in place. (Doc. 1, pgs. 2, 14). This was despite the complaints by Plaintiff's parents to Defendant Gober, the principal and athletic director at Mascoutah High School, and the two members of the Board of Education, including complaints related to the "demoralizing and degrading [practice] activities." (Doc. 1, pgs. 2, 15). Plaintiff's mother allegedly sought, but did not receive a follow-up on, a full

investigation. (Doc. 1, pgs. 13-14). Instead, on March 1, 2022, which was after the volleyball season, Plaintiff's mother was informed that her concerns were reviewed, and certain "confidential expectations" were implemented. (Doc. 1, pg. 16).

Here, although questions remain outstanding, the Court finds Plaintiff has plausibly stated a claim of sex discrimination by Defendant Gober under § 1983. In short, Plaintiff has adequately alleged she was subjected to Defendant Gober's alleged misconduct due to her sex and for reasons related to intimidation, humiliation, power, and control. The same is true with respect to the District, as it is conceivable from the allegations in the Complaint that the District engaged in an informal but widespread practice or custom, or authorized an action by a final policymaker, that resulted in sex discrimination. *See Walker*, No. 19-cv-4115, 2021 WL 1143517, *4; *Gernetzke*, 274 F.3d at 468; *J.H.*, 160 F. Supp. 3d at 1086. Further, based on the allegations related to the complaints of Plaintiff and her parents, it is plausible that the District is culpable, *i.e.*, that its final policymakers were deliberately indifferent to a known risk of sex discrimination. *See Walker*, No. 19-cv-4115, 2021 WL 1143517, *4; *see also J.H.*, 160 F. Supp. 3d at 1086 (noting "a policy of non-response—that is, 'a deliberate refusal to respond to complaints of harassment'—is actionable under the Equal Protection Clause. [Citation]."). Accordingly, the Court **FINDS** Plaintiff's allegations plausibly state claims for sex discrimination against Defendant Gober (Count V) and the District (Count III) under § 1983. *See Kloss*, 462 F. Supp. 3d at 876; *Fosnight*, 41 F.4th at 921-22.

## 2. Infringements of the Right to Free Speech

The First Amendment to the U.S. Constitution forbids public officials from subjecting individuals to retaliatory acts for engaging in protected speech. *See DeJong v. Pembrook*, --- F. Supp. 3d ----, 2023 WL 2572617, *7 (S.D. Ill. March 20, 2023) (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019)). Under § 1983, an individual may seek relief for First Amendment violations if the adverse action is taken based on protected speech and any nonretaliatory grounds for the action are insufficient to provoke the adverse consequences. *See DeJong*, 2023 WL 2572617, *7 (quoting *Nieves*, 139 S. Ct. at 1722). To plead a cause of action for retaliation in violation of the First Amendment, a plaintiff must allege (1) he or she engaged in constitutionally-protected speech, (2) he or she suffered a deprivation that was likely to deter future First Amendment activity, and (3) the constitutionally-protected speech "was 'a substantial or motivating factor' " for the retaliatory deprivation. *See Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 357 (7th Cir. 2005) (quoting *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. 37*, 260 F.3d 602, 618 (7th Cir. 2001)); *DeJong*, 2023 WL 2572617, *7 (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)).

Notably, the second element is subject to an objective test, *i.e.*, whether the alleged misconduct was likely to deter a person of ordinary firmness from continuing to engage in protected activity. *See DeJong*, 2023 WL 2572617, *7; *see also R.Z. ex rel. Zimmer v. Carmel Clay Schools*, 868 F. Supp. 2d 785, 798 (S.D. Ind. April 11, 2012) ("This is an objective test, but it is also context-specific, so [the] Court conducts the analysis with an eye toward the special characteristics of schools."). The alleged misconduct must constitute more than mere criticism or condemnation. *See DeJong*, 2023 WL 2572617, *8 (quoting *Novoselsky v.*

20

*Brown*, 822 F.3d 342, 356 (7th Cir. 2016)). Statements by a public official are actionable if they "rise to the level of threat, coercion, intimidation that punishment, sanction, or adverse regulatory action will immediately follow, or profound humiliation." *See id.* (quoting *Novoselsky*, 822 F.3d at 356-57). Public officials' alleged misconduct is also actionable if it "subject[s] an individual to embarrassment, humiliation, and emotional distress, but such cases are limited by a high bar, usually only met in circumstances of the release of highly personal and extremely humiliating details to the public." *See DeJong*, 2023 WL 2572617, *8 (quoting *Novoselsky*, 822 F.3d at 356). Further, under the third element, awareness or knowledge of the constitutionally-protected speech "is one component of demonstrating" the retaliatory deprivation was motivated by the speech. *See id.* at *10 (citing *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019)).

Defendants argue Plaintiff's alleged protected speech relates to unspecified discussions with the counselor at Mascoutah High School, such that it is impossible to gauge whether the discussions constituted protected speech. (Doc. 23, pgs. 12-13). Further, Defendants note Plaintiff's own Complaint speculates that the counselor's motivation for making a report to the athletic director was a statement by Plaintiff's teammate and not a statement by Plaintiff. (Doc. 23, pg. 13). Also, Defendants again argue the officials complained to, namely, the counselor, athletic director, and principal, were not final policymakers and no member of the Board of Education was notified of the allegations until after the volleyball season. (Doc. 23, pg. 12). In any event, Defendants suggest a high school athlete's criticism of a coach does not constitute protected speech and Plaintiff did not suffer adverse actions likely to deter protected speech. (Doc. 23, pgs.

13-14). Finally, Defendants argue Plaintiff cannot show any protected speech was the cause of the alleged retaliation, as "[n]on-senior players who did not speak with the counselor and who were injured were also prohibited from…activities." (Doc. 23, pg. 14).

Plaintiff argues her free speech rights extended to matters related to the volleyball team. (Doc. 24, pgs. 14-15). Further, Plaintiff argues the counselor's motivation for disclosing certain information related to her meetings with the four seniors to the athletic director is irrelevant, as Defendant Gober still punished Plaintiff and the four seniors for raising concerns to the counselor. (Doc. 24, pg. 15). Plaintiff also suggests, in response to the argument that Plaintiff did not suffer an adverse action that was likely to deter speech, the First Amendment protects individuals from even trivial acts of retaliation. (Doc. 24, pg. 15). In doing so, Plaintiff emphasizes the specific allegations against Defendant Gober, which allegedly had a chilling effect on Plaintiff's free speech rights, immediately after she "work[ed] up the courage to talk to the school counselor." (Doc. 24, pgs. 16-17).

In this case, Plaintiff alleges, on August 27, 2021, Plaintiff met with a counselor at Mascoutah High School about her experience on the volleyball team. (Doc. 1, pgs. 2, 6). Plaintiff informed her teammates of the meeting and of her belief that it would be helpful for the teammates to also meet with the counselor. (Doc. 1, pgs. 2, 7). That same afternoon, three other senior members of the volleyball team met with the counselor. (Doc. 1, pgs. 2, 7). One of the girls allegedly made a statement that compelled the counselor "to report minimal information to administration," namely, the Mascoutah High School athletic director. (Doc. 1, pgs. 2, 7). The athletic director then allegedly left the high school, drove

to Defendant Gober's place of employment, and informed Defendant Gober of the concerns reported to the counselor by the four senior team members. (Doc. 1, pgs. 2, 7).

At practice that Friday afternoon, Defendant Gober pulled the four seniors aside for a private meeting. (Doc. 1, pg. 8). He "scolded the four seniors for approximately 45 minutes" and singled Plaintiff out as "poison," indicated they betrayed him by speaking to the counselor, stated they were not to speak to the counselor again, and disallowed them from practicing that day. (Doc. 1, pgs. 2, 8). Defendant Gober also indicated the four seniors were weak, disrespectful for going outside the chain-of-command, out for his job, and would not tell him how to run the volleyball program. (Doc. 1, pg. 8).

On the following Sunday, August 29, 2021, Plaintiff's father met with Defendant Gober, at which time Defendant Gober allegedly indicated he was going to punish the four seniors to set an example. (Doc. 1, pg. 8). At the next practice, which was held on Monday, August 30, 2021, Defendant Gober pulled the four seniors aside for another private meeting. (Doc. 1, pg. 8). It was at this time that Defendant Gober instituted the above-described conditions on their team membership. (Doc. 1, pg. 8). Previously, despite her injury, Plaintiff was not subjected to these conditions. (Doc. 1, pg. 9).

In response to the alleged misconduct, the District allegedly failed to discipline or terminate Defendant Gober, or take any other action to protect the team members, and instead allowed him to continue coaching with the conditions in place. (Doc. 1, pgs. 2, 14). This was despite complaints by Plaintiff's parents to Defendant Gober, the principal and athletic director at Mascoutah High School, and two members of the Board of Education. (Doc. 1, pg. 2). Those complaints allegedly related to, *inter alia*, the conditions

on team membership and Defendant Gober's retaliation for the four seniors speaking to the school counselor. (Doc. 1, pgs. 12-15). Plaintiff's mother requested a full investigation into Defendant Gober's conduct. (Doc. 1, pg. 13). But, according to Plaintiff, she never received a follow-up on an investigation. (Doc. 1, pg. 14). Rather, after the season, on March 1, 2022, Plaintiff's mother was allegedly informed that her concerns had been reviewed and certain "confidential expectations" were implemented. (Doc. 1, pg. 16).

With these allegations, Plaintiff has plausibly alleged First Amendment retaliation by Defendant Gober and the District under § 1983. First, at this stage in the case, it is plausible to conclude that Plaintiff engaged in protected speech when meeting with the school counselor. Second, based on the alleged facts, it is plausible that Plaintiff suffered a deprivation that would deter future First Amendment activity. *See DeJong*, 2023 WL 2572617, *7-8; *see also R.Z. ex rel. Zimmer*, 868 F. Supp. 2d at 798 ("Given the unique student-teacher relationship, it is possible that mere verbal censure by a teacher could constitute an adverse action."). After all, in a single day, Plaintiff allegedly met with the counselor, the athletic director allegedly informed Defendant Gober of that meeting, and Defendant Gober allegedly confronted the four seniors about those meetings. Third, it is plausible to conclude that the protected speech "was 'a substantial or motivating factor' " for Defendant Gober. *See Kiddy-Brown*, 408 F.3d at 357; *DeJong*, 2023 WL 2572617, *7. He allegedly indicated to Plaintiff's father that he intended to use the four seniors to set an example for the team. Further, in the private meetings with Plaintiff and her teammates, Defendant Gober allegedly referenced the betrayal stemming from their meetings with the counselor and indicated that they were not to meet with the counselor again.

With respect to the District, it is again conceivable that the District engaged in an informal but widespread practice or custom, or authorized an action by a final policymaker, that resulted in First Amendment retaliation. *See Walker*, No. 19-cv-4115, 2021 WL 1143517, *4; *Gernetzke*, 274 F.3d at 468; *J.H.*, 160 F. Supp. 3d at 1086. Likewise, based on the alleged complaints of Plaintiff and her parents, it is plausible that the District is culpable, *i.e.*, that its final policymakers were deliberately indifferent to a known risk of First Amendment retaliation. *See Walker*, No. 19-cv-4115, 2021 WL 1143517, *4; *J.H.*, 160 F. Supp. 3d at 1086. Therefore, the Court **FINDS** the allegations plausibly state claims for First Amendment retaliation against Defendant Gober (Count VI) and the District (Count IV) under § 1983. *See Kloss*, 462 F. Supp. 3d at 876; *Fosnight*, 41 F.4th at 921-22.

### C. The Intentional Infliction of Emotional Distress by Defendant Gober (Count IX) and the District (Count X) under Illinois Law

A cause of action for the intentional infliction of emotional distress requires: (1) conduct that is truly extreme and outrageous in view of all the facts and circumstances; (2) an intent for the conduct to inflict severe emotional distress or knowledge that there is a high probability that the conduct will cause severe emotional distress; and (3) severe emotional distress that was in fact caused by the conduct. *See McGrath v. Fahey*, 126 Ill. 2d 78, 86, 90 (1988) (citing *Public Fin. Corp. v. Davis*, 66 Ill. 2d 85, 90 (1976)); *accord Schweihs v. Chase Home Finance*, LLC, 2016 IL 120041, ¶¶ 50, 52. The cause of action does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *See McGrath*, 126 Ill. 2d at 86 (citing Restatement (Second) of Torts § 46, cmt. d, 73 (1965)); *accord Schweihs*, 2016 IL 120041, ¶ 51. Instead,

25

the emotional distress must be such that no reasonable person can be expected to endure it. *See McGrath*, 126 Ill. 2d at 86; *accord Schweihs*, 2016 IL 120041, ¶ 51 (stating this requirement and elaborating that " '[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' [Citations]." Indeed, it has not been enough that a defendant acted with a tortious or criminal intent, intended to cause emotional distress, or acted with malice or a degree of aggravation that would entitle the plaintiff to punitive damages. *See Schweihs*, 2016 IL 120041, ¶ 51. In assessing the severity of the emotional distress, the Court considers its intensity and duration. *See McGrath*, 126 Ill. 2d at 86 (citing Restatement (Second) of Torts § 46, cmt. j., 77-78 (1965)); *accord Schweihs*, 2016 IL 120041, ¶ 51.

Further, under the first requirement, "the degree of power or authority which a defendant has over a plaintiff can impact…whether that defendant's conduct is outrageous." *See McGrath*, 126 Ill. 2d at 86; *accord Schweihs*, 2016 IL 120041, ¶ 52. In other words, the more control that the defendant has over the plaintiff, the more likely that the defendant's conduct will be found to be outrageous. *See McGrath*, 126 Ill. 2d at 86-87. This is especially the case where the alleged conduct of the defendant involved a veiled or explicit threat to exercise his or her authority to the detriment of the plaintiff. *See id.* at 87. After all, a threat is more likely to be a part of outrageous conduct when it is made by someone who can carry it out. *See id.* " 'The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position[,] which gives him actual or apparent power to damage the plaintiff's

interests.' [Citation]." *See id.* (citing *Milton v. Illinois Bell Telephone Co.*, 101 Ill. App. 3d 75, 79 (1981)). As noted by the Supreme Court of Illinois, the Restatement (Second) of Torts recognizes that "school authorities" may be positioned to exercise power or authority over a plaintiff. *See id.* (citing Restatement (Second) of Torts, § 46, cmt. e, 74 (1965)).

Notably, if a defendant is alleged to have improperly used his or her position of power or authority, then courts view that allegation in conjunction with whether the defendant reasonably believed his or her objective was legitimate. *See id.* at 88; *accord Schweihs*, 2016 IL 120041, ¶ 52. Courts also consider whether a defendant is aware the plaintiff is "peculiarly susceptible" to emotional distress due to a physical or mental condition. *See McGrath*, 126 Ill. 2d at 89-90. If a defendant knows the plaintiff is peculiarly susceptible to emotional distress, then conduct, while rude, abrasive, or extremely inconsiderate, but not usually actionable, may be deemed outrageous. *See id.* at 90. Finally, an employer can be liable for the intentional infliction of emotional distress, based on a theory of *respondeat superior*, if an employee acts within the scope of employment. *See Jimenez v. Thompson Steel Co., Inc.*, 264 F. Supp. 2d 693, 696 (N.D. Ill. 2003); *accord Curran v. JP Morgan Chase, N.A.*, 633 F. Supp. 2d 639, 643 (N.D. Ill. 2009).

Defendants argue the alleged misconduct identified by Plaintiff was not extreme and outrageous. (Doc. 23, pg. 19). Since all of the volleyball team members participated in the practice activities, which were "presumably designed to maximize their performance," Defendants suggest it is unlikely the participation caused distress that no reasonable person could be expected to endure. (Doc. 23, pg. 19). Defendants note, while

27

Defendant Gober was in a position of authority over Plaintiff, Plaintiff did not allege facts showing he abused his coaching position for illegitimate gain. (Doc. 23, pg. 20).

In response, Plaintiff argues Defendant Gober's alleged misconduct was directly related to the authority he held as her volleyball coach, which Plaintiff believes could lower the bar for showing that misconduct was outrageous. (Doc. 23, pgs. 19-20). But there is no need to lower the bar, Plaintiff stresses, because the alleged misconduct "truly shock[s] the conscience." (Doc. 23, pg. 20). Plaintiff also argues the alleged misconduct was not designed to maximize performance but rather to humiliate and degrade Plaintiff and her teammates. (Doc. 23, pg. 20). Further, Plaintiff argues Defendant Gober knew she was susceptible to emotional distress after she spoke to a counselor. (Doc. 23, pg. 20).

Here, in addition to the other allegations discussed in this Memorandum & Order, related to the "demoralizing and degrading [practice] activities" and the conditions for continued team membership, Plaintiff alleges she was pulled aside at practice for private meetings between herself, three other teammates, and Defendant Gober. (Doc. 1, pg. 8). This occurred on the same day that Plaintiff and her three other teammates met with a school counselor about their experiences on the volleyball team. (Doc. 1, pgs. 2, 6). In those private meetings, Defendant Gober allegedly, *inter alia*, singled Plaintiff out as "poison," indicated the four seniors betrayed him for speaking to the counselor and were not to do so again, were weak, and were disrespectful for going outside the chain of command. (Doc. 1, pg. 8). Further, on one occasion, Defendant Gober allegedly "forced the girls to stand up in front of the school's spectators at a game[] while he screamed at the girls for 'letting down their fans.' " (Doc. 1, pgs. 2, 6). Defendant Gober allegedly

28

sought to intimidate and humiliate, as well as exert power and control over, the volleyball team members. (Doc. 1, pg. 6). Also, in her complaints to the Mascoutah High School officials, Plaintiff's mother allegedly indicated to the counselor that Plaintiff's health, safety, and mental wellness was at risk because she utilized a school resource, *i.e.*, the counselor. (Doc. 1, pg. 12). Similarly, in her complaints to the two members of the Board of Education, Plaintiff's mother allegedly noted Plaintiff's grades were slipping and she faced a "dangerous mental health situation." (Doc. 1, pg. 15).

The Court notes, at this stage, it is unaware of the exact nature of Defendant Gober's conduct. Nevertheless, Plaintiff has done enough to thinly survive a motion to dismiss under Rule 12(b)(6). *See Jimenez*, 264 F. Supp. 2d at 696 (stating, absent knowledge of the details of the alleged harassment, the court was left with the possibility that the alleged conduct was extreme and outrageous). This is especially so where Defendant Gober, as Plaintiff's coach, exercised a degree of control over Plaintiff and used his related authority in response to Plaintiff speaking to a school counselor. *See McGrath*, 126 Ill. 2d at 86-87. Defendant Gober may have believed his actions were legitimate, and they may indeed be determined to be legitimate,  but those questions related to the nature of Defendant Gober's alleged conduct or state of mind are not properly decided on the pleadings. *See id*. at 88; *Schweihs*, 2016 IL 120041, ¶ 52. Therefore, the Court **FINDS** Plaintiff has plausibly stated a claim for relief from Defendant Gober (Count IX) and the District (Count X) for the intentional infliction of emotional distress. *See Kloss*, 462 F. Supp. 3d at 876; *Fosnight*, 41 F.4th at 921-22.

### D. Qualified Immunity

Finally, the Court notes that the Motion argues Defendant Gober is entitled to qualified immunity. (Doc. 23, pg. 16). Generally, qualified immunity is an affirmative defense that must be pled and proven. *See Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 471 (7th Cir. 1997) (*Sivard v. Pulaski County*, 17 F.3d 185, 189 (7th Cir. 1994)). Further, although qualified immunity may be raised in a motion to dismiss, the Court may only consider the allegations contained in the complaint. *See id.* (citing *Kernats v. O'Sullivan*, 35 F.3d 1171, 1175-76 (7th Cir. 1994)). Since the issue is fact-driven and a plaintiff need not allege detailed facts in the complaint, it is often inadvisable to consider qualified immunity on the pleadings. *See Beathard v. Lyons*, 620 F. Supp. 3d 775, 783-84 (C.D. Ill. 2022) (citing *Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019)). The Court believes it to be so at this time. Accordingly, the Court declines to consider a claim of qualified immunity at this stage in the case.

### III. Conclusion

For the foregoing reasons, the Motion is **DENIED**.

**SO ORDERED.**

Dated: July 31, 2023

DAVID W. DUGAN
United States District Judge